**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

   -vs-                                                                       CRIMINAL No. 10-2311 LH

JESSICA GRIEGO,

        Defendant

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes on for consideration of Defendant's Motion to Suppress Fruits of Search of Her Purse for Violation of the Fourth Amendment (Docket No. 23) and Defendant's Motion to Suppress Testimony of Deputy Tonna Based on Prior Perjury in This Case or in the Alternative, to Disqualify the United States Attorney's Office from Prosecuting Defendant Based on Its Conflict of Interest Evident in Its Decision Not to Prosecute Tonna for Perjury (Docket No. 24), both filed October 14, 2010.  The Court, having reviewed the Motions, the accompanying and supplemental memoranda, and the applicable law, having heard evidence at the hearing held January 12, 2011, and otherwise being fully advised, finds that the Motions are not well taken and will be **denied**.

**FACTUAL FINDINGS**

At about 3:00 in the afternoon, on July 14, 2010, Bernalillo County Sheriff's Detective Robert Bolin (Det. Bolin) contacted Deputy Lawrence Tonna (Deputy Tonna) of the Bernalillo County Sheriff's Traffic Unit and asked Deputy Tonna to meet with him.  At their meeting, Det.

Bolin gave Deputy Tonna a vehicle description, its license plate number, and the name of the female driver, and requested that Deputy Tonna find probable cause to stop the car. Det. Bolin explained that he had information from a confidential informant that the vehicle was going to a certain residence to purchase drugs.

At approximately 3:42 p.m., Deputy Tonna encountered the subject vehicle and observed it make a left-hand turn without signaling, with other vehicles present, behind and next to it. Deputy Tonna followed the car, pacing its speed at 51 miles per hour in a posted 35-mile per-hour zone. He also ran the license number through MVD files on his computer and learned the license plate registration had expired several days earlier, on July 11, 2010. Deputy Tonna initiated a traffic stop and the vehicle pulled over on the right, next to the roadway. Defendant Jessica Griego was the driver and sole occupant.

As part of standard operating procedure for all traffic stops, Deputy Tonna turned on his audio belt tape recorder as he approached the car.[1] He told Ms. Griego that he stopped her for failure to signal the left turn she had made at the light. He also informed her that the front windshield was cracked and that the vehicle's license plate had expired on July 11th, even though the sticker on it was current. He asked to check the paperwork. When Ms. Griego said the car belonged to her boyfriend and asked if she could call him to see where the paperwork was, Deputy Tonna asked her for her driver's license. She responded that she did not have one. Deputy Tonna then asked her if she had any other identification and told her to get her purse and step out of the car, to the front of the vehicle.

---

[1] The corrected transcript of Deputy Tonna's belt tape recording is attached to the United State's Response in Opposition to Defendant Jessica Griego's Motion to Suppress Fruits Search of Her Purse for Violation of the Fourth Amendment Filed October 14, 2010 (Docket No. 37), filed Nov. 18, 2010, Ex. 1 ("Tr. Belt Tape"). The original was provided by Defendant and edited by the government only to attribute certain speech to the correct officer.

Bernalillo County Sheriff's Deputy Chris Mancha (Deputy Mancha), also of the Traffic Division, arrived to assist Deputy Tonna. Deputy Mancha also had been looking for Defendant's vehicle, having been requested to do so by Det. Bolin and Det. Michael Fisher. He had spotted the vehicle and was behind it when it made the left-hand turn without signaling, but then had lost it in the traffic. Deputy Tonna informed him that Ms. Griego had not used her turn signal, had a cracked windshield and an expired plate, and did not have a driver's license. Deputy Mancha asked Ms. Griego about a driver's license and she repeated that she did not have one, adding that she had never had a driver's license. In response to Deputy Tonna's inquiry about her age, Ms. Griego told him that she was 31 years old.

After the officers asked Defendant for some other form of identification, Ms. Griego said that she only had an EBT card with her name on it.[2] For officer security purposes because Defendant could not provide identification and they were unsure with whom they were dealing, Deputy Tonna told Ms. Griego to put her purse on the hood of the car and that he was going to pat her down for weapons. While Ms. Griego was being patted down,[3] Deputy Mancha commented that she was "shaking like a leaf," and asked why she was so nervous. Ms. Griego responded that it was because she did not have her license. She then provided the deputies with her date of birth, social security number, and address, and told them she did have a valid ID, but it was at home and that the address needed to be changed on it.

Deputy Tonna inquired again about insurance papers and asked Ms. Griego to look in the vehicle for them and the registration. Only expired paperwork was found and Deputy Tonna

---

[2] Defendant testified at the evidentiary hearing that she gave Deputy Tonna her ID card and that he never returned it to her. The Court finds this testimony not credible.

[3] Each officer testified that the other patted down Ms. Griego. Ms. Griego testified that Deputy Mancha patted her down. The Court does not find this discrepancy of importance.

explained that if insurance is not paid, the license plate registration is suspended and reported as expired. For officer safety purposes, so that he could continue to watch her while he returned to his patrol car, Deputy Tonna asked Ms. Griego to step to the back of her vehicle and sit on the bumper. To save tape, he turned his belt tape off as he and Deputy Mancha returned to his unit.[4]

In his vehicle, Deputy Tonna entered Ms. Griego's personal information into MVD and NCIC files on his computer. These sources revealed that Defendant had only a suspended ID card, no driver's license, that she was on felony probation for unlawful use of a false identification, and the name of her probation officer. Deputy Tonna shared this information with Deputy Mancha, who went back to Ms. Griego. She told him the name of her probation officer, thereby confirming her identity to his satisfaction. Deputy Mancha returned to Deputy Tonna's vehicle and they discussed how they would proceed. Deputy Tonna also wrote two citations for Ms. Griego.

After approximately ten to fifteen minutes, the deputies rejoined Ms. Griego at the rear of her vehicle. Deputy Tonna, who had restarted his belt tape, advised Ms. Griego about the traffic citations he was issuing for failure to signal and failure to have a driver's license. Ms. Griego signed both citations. After a brief discussion about the weather and where Ms. Griego needed to take the car, Deputy Tonna said, "All right. These are your tickets. Do you have any questions?" Deputy Mancha added, "We're done with that." Deputy Tonna repeated, "Do you have any questions," to which Ms. Griego responded, "No, I don't." Deputy Tonna then asked Ms. Griego about the

---

[4] Defendant contends that Deputy Tonna's testimony at the Preliminary/Detention Hearing that the belt tape was on "throughout the encounter with Ms. Griego," (Tr. of Prelim./Detention Hr'g ("Tr. Prelim. Hr'g") (Docket No. 9), filed July 26, 2011, at 13:7-9) is contradictory to his testimony at the Suppression Hearing, casting doubt on his credibility. The Court does not agree and finds both Deputy Tonna's and Deputy Mancha's testimony generally credible. Furthermore, it is undisputed that the belt tape was on at all times that Deputy Tonna was in contact with Defendant.

location of the keys for the vehicle.[5] Ms. Griego told him that they were in the ignition and he said, "All right. Let's get back to the car."

As Ms. Griego, accompanied by the deputies, returned to her vehicle and got in the driver's seat,[6] the following conversation took place:

| | |
|---|---|
| DEPUTY MANCHA: | I ask everybody is there anything illegal anything on you anything that we need to know about? Now is the time to tell us. |
| J. GRIEGO: | Nothing. |
| DEPUTY TONNA: | Okay. |
| J. GRIEGO: | Oh, you mean-, for my purse or something? |
| DEPUTY MANCHA: | Yeah. We're talking about your purse, your car and there's nothing that-, because I don't like talking to people with guns and stuff like that. |
| J. GRIEGO: | I have a knife in my purse. |
| DEPUTY MANCHA: | You have a knife? |
| J. GRIEGO: | A pocketknife.[7] |
| DEPUTY MANCHA: | Okay. If you don't mind us making sure that the car is safe before we let you go because I don't ever deal with-, I always do that when I talk to people. |
| J. GRIEGO: | Yeah. |

---

[5] Deputy Tonna inquired about the keys because it sometimes was his practice, for officer safety purposes, to have drivers remove the keys when he asked them to step out of a vehicle. He could not remember whether he had asked Ms. Griego to do so.

[6] Defendant testified that she did not reenter the car, that her purse was still on the hood of the vehicle, and that while standing outside the car she tried to reach around Deputy Mancha to remove the keys from the ignition. The Court does not find this testimony credible.

[7] The Court notes that the knife was by no means the usual small pocketknife. It appeared to be about six inches long, unopened.

| | |
|---|---|
| DEPUTY MANCHA: | Because I don't-, I don't like to be, you know. A few years ago he lost his buddy and the man go shot. |
| J. GRIEGO: | No, go ahead. |
| DEPUTY TONNA: | Come on out. Get your purse. I got to look in there- |
| | (Inaudible, multiple voices) |
| DEPUTY MANCHA: | Where's the knife at? |
| J. GRIEGO: | Oh, I'll get it. |
| DEPUTY TONNA: | Just wait until we're done, we'll get it. I don't want you to get it. |

Tr. Belt Tape 9:25-10:24 (altered to attribute "Police Officer2" statements to Deputy Mancha).

When Ms. Griego got out of the vehicle, she started opening her purse to get the knife but Deputy Tonna stopped her and took the purse from her. Despite Ms. Griego's subsequent offer to retrieve the knife, Deputy Tonna told her he didn't want her to get it and proceeded to look in the purse himself.[8] Searching through the contents, which included hair spray, a wallet, various kinds of makeup, pencils, and a card, he found the knife near the bottom of the purse. It was on top of a large clip plastic bag of white crystal shards that appeared to be methamphetamine, and beneath the bag was a clear glass pipe with residue on it and a small vial. Deputy Tonna removed the knife and

---

[8] Ms. Griego testified that the knife was clipped into the outside pocket of the purse, with the upper portion of the knife visible, that she removed the knife from the outside pocket herself, and that she had the purse in her hands while it sat on the hood of the car as Deputy Tonna pulled things out of it and set them on the hood. The Court does not find this testimony to be credible.

Defendant also claims that at the Preliminary Hearing, "Deputy Tonna testified that the knife was in one of the front pockets of Ms. Griego's purse," Def.'s Supplemental Argument (Docket No. 46), filed Jan. 17, 2001, at 14 n.1, citing the transcript. The transcript does not support this assertion, reading in relevant part:

Q: The purse . . . has a main compartment and a front pocket, correct?
A: It had several compartments.
Q: . . . . And the knife that Ms. Griego was retrieving was in the front pocket of her purse, correct?
A: It was in one of them

Tr. Prelim. Hr'g 18:20-25.

6

secured it in his pocket. He asked, "What's this?" Ms. Griego responded, "A cut." When asked again, "How much, what is this-, what is this?" she said, "I don't know." When Deputy Tonna followed with "It's Crystal Meth?" she answered, "Yeah, I smoke it."

Following further questioning about whether there were any weapons in the car or drugs in her purse or on her person, Deputy Mancha *Mirandized* Ms. Griego and placed her in his patrol car. Deputy Tonna then conferred with dispatch and Det. Bolin, who asked them to take Ms. Griego to the substation. After asking Deputy Mancha to transport Defendant, Deputy Tonna turned off his belt tape recorder.

### DEFENDANT'S MOTION TO SUPPRESS TESTIMONY OF DEPUTY TONNA BASED ON PRIOR PERJURY IN THIS CASE OR IN THE ALTERNATIVE, TO DISQUALIFY THE UNITED STATES ATTORNEY'S OFFICE FROM PROSECUTING DEFENDANT BASED ON ITS CONFLICT OF INTEREST EVIDENT IN ITS DECISION NOT TO PROSECUTE TONNA FOR PERJURY

Defendant bases this Motion on the fact that Deputy Tonna failed to mention in his police report regarding the arrest of Ms. Griego or in his testimony at the Preliminary Hearing that Det. Bolin had asked him to stop the car Ms. Griego was driving. At the Preliminary Hearing, the following exchange took place between Deputy Tonna and Defendant's attorney:[9]

> Q. Why did you stop Ms. Griego after you told her she was free to leave and ask her if she had any dangerous weapons?
>
> A. She was on probation.
>
> Q. Okay. So you just chose to investigate further at that point?
>
> A. Correct.
>
> Q. Okay. Was there any particular reason?

---

[9] Current counsel for both the government and Defendant entered their appearances in this case subsequent to the Preliminary Hearing, the Prosecutor later that day and Defense Counsel on August 18, 2010.

> A. She was on probation.
>
> Q. No other reason than that?
>
> A. No.
>
> Q. Okay.

Tr. Prelim. Hr'g 23:2-12.  On August 3, 2010, the government sent a letter to the Magistrate Judge who had presided over the Preliminary Hearing, informing him that he had determined that Deputy Tonna's statement "was not entirely accurate," and that the complete answer was that

> Deputy Tonna also had information from law enforcement sources indicating that defendant Garcia [sic] might be involved in drug-related activities and that he was asked to develop probable cause for a traffic stop.[10]

Letter (Docket No. 26), filed Oct. 19, 2010.

In addition to supposedly being grounds for dismissal of the Indictment, Defendant argues that Deputy Tonna's "misleading and incorrect" Preliminary Hearing testimony should have caused to government to conduct an investigation and prosecute him for obstruction, in violation of 18 U.S.C. § 1503; perjury, in violation of 18 U.S.C. § 1621; court perjury, in violation of 18 U.S.C. § 1623; and/or false statements, in violation of 18 U.S.C. § 1001.  She further contends that due to an apparent conflict of interest, the United States Attorney should be disqualified from prosecuting this case.

The government responds by first pointing out the misstatements Defendant makes regarding the facts of this case.[11]  Then, observing that Defendant's argument is based on "pure speculation

---

[10] Deputy Tonna further clarified at the Suppression Hearing that he "was a bit confused [at the Preliminary Hearing], and I was really trying to protect the integrity of the ongoing investigation involving a confidential witness." Tr. Hr'g Mot. Suppress (Docket No. 52), filed Feb. 3, 2011, 39:11-13.

[11] Defendant has argued in both of her pending Motions that Deputy Tonna was instructed "to stop Ms. Griego's car and develop probable cause to search for drugs . . . to stop the car to investigate drug-related activities . . . to stop and search her for drugs" and that "he was supposed to find probable cause for a drug-related investigation."

that Deputy Tonna will be untruthful at future proceedings," the government discusses in some detail why the Court does not have authority to disqualify the U.S. Attorney's office, primarily due to separation of powers issues. The government next addresses why the U.S. Attorney's office does not have a conflict of interest in this case. Finally, the government argues that Deputy Tonna's testimony should not be suppressed, asserting that the United States has and continues to meet its obligation under *Giglio*, that Defendant is trying to harass government witnesses, and that she is trying to transform a credibility issue into an exclusionary rule. Defendant did not file a reply brief or readdress this Motion in her supplemental brief.

The Court finds that the Motion must be denied. To the extent that the facts of this case may raise issues of credibility, Defendant had ample opportunity to address them on cross examination of both Deputy Tonna and Deputy Mancha at the evidentiary hearing and may again do so at trial. They in no way, however, constitute sufficient grounds for suppressing Deputy Tonna's testimony and do not support allegations of perjury. Neither is there any basis upon which the Court should disqualify the United States Attorney's Office from prosecuting this matter.

**DEFENDANT'S MOTION TO SUPPRESS FRUITS OF SEARCH OF HER PURSE FOR VIOLATION OF THE FOURTH AMENDMENT**

A traffic stop is a seizure within the meaning of the Fourth Amendment, although it is more analogous to an investigative detention than a custodial arrest. *See United States v. Botero-Ospina*,

---

Obviously, this is not what the government said in its letter. Nor did Deputy Tonna or Deputy Mancha so testify regarding their pre-encounter conversation with Det. Bolin at the hearing on these Motions.

Additionally, as the government notes in its Supplemental Response in Opposition to Defendant's Motion (Docket No. 48), filed Jan. 24, 2011, Defendant's speculation regarding "a distinct possibility that the officers cobbled later knowledge of Ms. Griego's probation status into their traffic stop narrative, to support their need to search and detain further than the simple traffic infractions would allow," was negated by Ms. Griego's own testimony at the evidentiary hearing. *See* Tr. Hr'g Mot. Suppress 131:24-132:7 ("[Deputy Mancha] asked was I on probation and what was my probation officer's name. And that's when I told him . . . ."

71 F.3d 783, 786 (10th Cir. 1995) (en banc); *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) ("For Fourth Amendment purposes, the legality of a traffic stop is assessed pursuant to the framework established in *Terry v. Ohio*, 391 U.S. 1 [(1968)]."). Thus, in determining the reasonableness of a traffic stop or an investigative detention, the Court undertakes a dual inquiry: (1) "whether the traffic stop 'was justified at its inception,'" and (2) "if the stop was justified, . . . 'whether the resulting detention was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Polly*, 630 F3d at 997 (quoting *United States v. Winder*, 557 F.3d 1133, 1133-34 (10th Cir. 2009) (internal quotation marks omitted)).

An officer may extend a traffic stop beyond its initial scope only if during the course of the stop, "(1) the officer develops an 'objectively reasonable and articulable suspicion' that the driver is engaged in some illegal activity, or (2) 'the initial detention . . . become[s] a consensual encounter.'" *United States v. Rosborough* 366 F.3d 1145, 1148 (10th Cir. 2004) (citing *United States v. McRae,* 81 F.3d 1528, 1534 (10th Cir. 1996)) (alteration in original). Furthermore, it is well-settled "that 'the nature of the police-citizen encounter can change---what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa.'" *United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (quoting *United States v. Zapata,* 997 F.2d 751, 756 n.3 (10th Cir.1993)).

**I.   Traffic Stop**

   **A.   The Stop Was Justified at its Inception**

   For an initial stop to be valid, it must be objectively justifiable:

   [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department of the

particular officer making the stop. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. [The] sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.

*Botero-Ospina*, 71 F.3d at 787 (internal quotations and citations omitted).

Defendant argues that because Deputy Tonna had reason other than any traffic violation for stopping Ms. Griego, specifically that Det. Bolin asked him to stop the vehicle because of a drug investigation, the stop was not valid. This argument is contrary to law and must be rejected. *See, e.g. Polly*, 630 F.3d at 997 ("Even if Polly is correct that the traffic stop was simply a ruse [so that officer could further his drug-trafficking investigation], that fact is legally irrelevant.").

Defendant also contends that because failure to signal is not a per se violation under New Mexico law,[12] Deputy Tonna lacked reasonable suspicion to stop Defendant, citing *State v. Anaya*, 143 N.M. 431, 435-36, 176 P.3d 1163, 1167-68 (Ct. App. 2007) (officer testified no other traffic in vicinity upon which failure to signal could have had effect, so no reasonable suspicion or probable cause justifying traffic stop). In subsequently addressing this statutory provision, the New Mexico Supreme Court explained that two elements must be met before a signal is required on turning: "(1) there must be other 'traffic' (2) that 'may be affected' by the motorist's turn." *State v. Hubble*, 146 N.M. 70, 74, 206 P.3d 579, 583 (2009). The court then found that the officer, "who was driving a vehicle on a highway, was 'traffic' under Section 66-7-325(A)." *Id.* at 74, 206 P.3d at 583. The court also "read the phrase 'may be affected' to mean when there is a *reasonable possibility* that other traffic may be affected." *Id.* at 75 206 P.3d at 584. Finally, the court concluded that "[t]he

---

[12] N.M. STAT. ANN. § 66-7-325, titled "Turning movements and required signals," provides in relevant part that "No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided *in the event any other traffic may be affected by such movement*." N.M. STAT. ANN. § 66-7-325(A) (emphasis added).

11

State was not required to prove that [the] Deputy . . . *could have* been affected, that he *was* affected, or that Defendant's turn *presented a potential hazard*; the statute only requires that the surrounding facts establish that there was a *reasonable possibility* that he may have been affected." *Id.* at 76, 206 P.3d at 585.

Deputy Tonna's stop of Ms. Griego for failure to signal her turn clearly meets the requirements of New Mexico law. First, there is no evidence that Defendant in fact did signal her turn. Additionally, there was detailed testimony at the hearing that when Ms. Griego turned without signaling, vehicles were nearby, behind and next to her, and Deputy Tonna was across the intersection in his patrol car, establishing a reasonable possibility that other traffic may have been affected. Thus, the stop was valid at its inception for failure to signal. Furthermore, Deputy Tonna also knew by pacing the vehicle, that it was traveling in excess of the posted speed limit,[13] and through his initial computer inquiry while following the vehicle, he learned that the license tag was expired.[14] There is no doubt that this stop justified at its inception.

### B. The Scope of the Stop Was Reasonable

---

[13] N.M. STAT. ANN. § 66-7-301, titled " Speed regulation," provides in relevant part:

A. No person shall drive a vehicle on a highway at a speed greater than:
. . .
(2) thirty miles per hour in a business or residence district;
. . .
B. In every event, speed shall be so controlled by the driver as may be necessary:
. . .
2) to comply with legal requirements as may be established by the state highway and transportation department or the New Mexico state police division of the department of public safety and the duty of all persons to use due care; and
. . .
C. The speed limits set forth in Subsection A of this section may be altered as authorized in Section 66-7-303 NMSA 1978[, titled "Establishment of speed zones"].

[14] N.M. STAT. ANN. § 66-3-18, titled "Display of registration plates and temporary registration permits; displays prohibited and allowed," provides in pertinent part : "No expired registration plate or validating sticker shall be displayed on the vehicle other than an expired special registration plate, which may be exhibited on the front of the vehicle." N.M. STAT. ANN. § 66-3-18(C).

When determining "whether the scope of a traffic stop was 'reasonably related to the circumstances which justified [the stop] in the first place,'" *Polly*, 630 F.3d at 997 (quoting *United States v. Eckhart*, 569 F.3d 1263, 1273 (10th Cir. 2009)), the focus is "'on the reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out,'" *id.* (quoting *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007)).

The detention of Ms. Griego was reasonable both as to the length of the stop and the manner in which it was conducted. The initial encounter with Ms. Griego lasted a little less than seven minutes. After Deputy Tonna informed Ms. Griego of the reasons for the stop, he asked her for the car's paperwork and her driver's license. Asking for this paperwork in the course of a traffic stop is permissible. *See, e.g., id.* at 998 (citing *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993)). Ms. Griego could not provide the registration or insurance papers, and informed Deputy Tonna that she did not have a driver's license and that the vehicle belonged to her boyfriend. Deputy Tonna then asked her if she had any other identification and told her get her purse and get out of the vehicle. Asking a driver to exit a vehicle is also permissible during a routine traffic stop, for purposes of officer safety. *Id.* Given the circumstances present here, with Defendant unable to provide identification and the deputies having information that she had just come from a drug buy, officer safety concerns were clearly met. Officer safety concerns also justified the pat down of Ms. Griego. *See, e.g., United States v. Garcia*, 459 F.3d 1059, 1064-66 (10th Cir. 2006) (discussing numerous cases finding that an individual's involvement with drug transactions can support reasonable suspicion to frisk that individual for weapons).

After Ms. Griego provided the deputies with her date of birth, social security number, and address, but was still unable to find current paperwork for the car, Deputy Tonna went to his unit to run her personal information on his computer. In addition to establishing that she had no driver's

license and a suspended ID card, he learned that she was on felony probation and the name of her probation officer. He shared this information with Deputy Mancha, who then questioned Ms. Griego about it to verify her identity. Deputy Tonna also wrote up the two citations. Additionally, the deputies discussed how they were going to proceed. All of this took between ten and fifteen minutes, not an unreasonable period of time.

The deputies then rejoined Ms. Griego at the back of her vehicle. Deputy Tonna explained the citations and Ms. Griego signed them. After determining that Ms. Griego did not have far to drive the vehicle home, Deputy Tonna gave her the tickets and asked if she had any questions. She did not. The Deputies accompanied Ms. Griego to the front of the car and she got in.. A little over one more minute had passed, for a total of approximately eighteen to twenty-four minutes since the stop was initiated. Both the duration of this stop and the manner in which it was conducted were reasonable.

## II.  Consensual Encounter

Defendant now had the citations, she returned to her vehicle and got behind the wheel, with the keys in the ignition. She was free to go. A very brief consensual conversation ensued.[15] *See United States v. Barraza-Martinez*, 364 F. App'x 453, 458 (10th Cir. 2010) ("Generally, '[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.'" (quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).

---

[15]  The government contends that considering the totality of circumstances present in this case, the deputies had reasonable suspicion at the conclusion of the traffic stop that Defendant possessed illegal drugs, thereby justifying her further detention. The Court agrees, but does not find it necessary to address this alternative argument.

Deputy Mancha inquired whether Ms. Griego had anything illegal on her and she replied that there was nothing. Unprompted, she immediately interjected, "Oh, you mean-, for my purse or something?" Deputy Mancha confirmed that he was talking about her purse and the car, and continued that he didn't like talking to people "with guns and stuff like that." Ms. Griego then said, "I have a knife in my purse." Confirming that Ms. Griego said she had a knife, which she then described as a pocketknife, Deputy Mancha again asked for permission to make sure that the car was safe, mentioning that a few years before, Deputy Tonna had "lost his buddy and the man got shot." Twice during this short exchange Ms. Griego agreed that the Deputies could make sure the car was safe. Deputy Mancha then said "Come on out," and Deputy Tonna added, "Get your purse. I got to look in there-."

The deputies conduct would not have conveyed to a reasonable person that "'he or she was not free to decline [their] requests or otherwise terminate the encounter." *See West*, 219 F.3d at 1176 (quoting *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996)). There was, for instance, no display of weapons, physical touching of Ms Griego, use of a commanding tone of voice, or intimidating body language. *See United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006). Nor were the deputies required to inform Ms. Griego that she did not have to respond to their questioning or that she was free to leave. *See United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005).

**III. Consensual Search**

"A valid search may be made of a vehicle without a warrant or probable cause when a person in control of the vehicle has given his voluntary consent to search." *United States v. Santurio*, 29 F.3d 550, 552 (10th Cir. 1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)); *see also, e.g., United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir.2001) ("[A] vehicle may be

searched if a person in control of the vehicle has given his voluntary consent to the search."). Whether consent is voluntary is "determined by the totality of the circumstances," applying a two-part test: (1) "the government must proffer clear and positive testimony that consent was unequivocal and specific and freely given," and (2) "the government must prove that this consent was given without implied or express duress or coercion." *Id.* (quotation omitted). "[C]onsent to search may be voluntary, however, even though the consenting party is being detained at the time consent is given." *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (quoting *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997)). Furthermore, "a general consent to search includes closed containers within the vehicle." *Santurio*, 29 F.3d at 553 (citing *Florida v. Jimeno*, 500 U.S. 248 (1991)).

The Court finds that Ms. Griego voluntarily consented not only to the search of her vehicle, but also to the search of her purse.[16] She was engaged in a consensual encounter with the deputies, who in no way coerced her consent. Deputy Mancha clearly explained to Ms. Griego that his inquiry about anything illegal, referred both to her purse and the car. Ms. Griego then freely consented twice for the deputies to search the car to make sure it was safe. Deputy Tonna then ruffled through the large main compartment of Ms. Griego's purse for the knife and found it nearly on the bottom, under a number of unremarkable items. Under the circumstances, it was reasonable that he declined to let Ms. Griego, a felony probationer believed to be involved with illegal drugs, retrieve the knife herself, and that he searched the purse before turning to the vehicle. Upon removing the knife to secure it, he saw under it a bag of what appeared to be methamphetamine,

---

[16] Defendant argues that her felony probationer status did not of itself justify the search of her purse. Considering the argument offered on this issue in this matter, the Court agrees that her status as a probationer did not provide grounds for the search, but was, of course, among the relevant circumstances known by the deputies.

which he also removed, revealing a glass pipe with residue and a small vial. Shortly thereafter, based on their discover of illegal drugs, the deputies arrested Ms. Griego.

WHEREFORE,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Fruits of Search of Her Purse for Violation of the Fourth Amendment (Docket No. 23), filed October 14, 2010, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Testimony of Deputy Tonna Based on Prior Perjury in This Case or in the Alternative, to Disqualify the United States Attorney's Office from Prosecuting Defendant Based on Its Conflict of Interest Evident in Its Decision Not to Prosecute Tonna for Perjury (Docket No. 24), filed October 14, 2010, is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**